## IN THE DISTRICT COURT OF MARYLAND

NISHITH PATEL

     Plaintiff,

*v.*

ERIN RISCH,

*And*

MARIANNE LEE,

*and*

ATTORNEY GRIEVANCE COMMISSION.

Case No: 22-CV-1297-TDC

```
———— FILED        ———— ENTERED
———— LOGGED       ———— RECEIVED

        MAY 3 1 2022

          AT GREENBELT
   CLERK, U.S. DISTRICT COURT
      DISTRICT OF MARYLAND
BY                        DEPUTY
```

## COMPLAINT

### Parties

1.    Plaintiff Mr. Patel presently resides in Maryland. His mailing address is 13410 Stonebridge Terrace, Germantown MD 20874.

2.    Defendant Erin Risch is employed as an attorney at the Maryland Attorney Grievance Commission. Her work address is 200 Harry Truman Parkway, Annapolis MD 21401. Her home address is yet unknown, but she is being sued in both her official and individual capacity.

3.    Defendant Marianne Lee is the Director the Attorney Grievance Commission.  Her work address is 200 Harry Truman Parkway, Annapolis MD 21401.

Her home address is yet unknown, but she is being sued in both her official and individual capacity.

4.      Defendant Attorney Grievance Commission is an agency of the State of Maryland. Its principal place of business is 200 Harry Truman Parkway, Annapolis MD 21401.

## Jurisdiction and Venue

5.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 (federal question) and its original jurisdiction on all constitutional law matters. Furthermore, jurisdiction is proper in this Court under the All Writs Act, 28 U.S.C. § 1651. Finally, jurisdiction is proper under 42 U.S.C § 1983.

6.      Venue is proper in this Court because the acts complained of herein occurred in Maryland.

## Statement of Facts

7.      Plaintiff Mr. Patel graduated from the University of Wisconsin Law School in 2007. During law school, Mr. Patel had a fairly good record, including participating in a national moot court and national mock trial competition. During law school, Mr. Patel also served as a teaching assistant for undergraduate First Amendment courses and taught Constitutional Law to law students. Mr. Patel's third-year grades would have placed him in the top 15% of his class. He had earned the second-highest grade in Business Organizations II and a top 5% grade in Business Organizations I.

8.      In late 2010, Mr. Patel moved to the D.C. metropolitan area with the goal of securing a federal position, and specifically with the Securities and Exchange Commission, where he had completed an internship during college. Mr. Patel took the

Maryland bar exam in 2011 and became a licensed attorney in Maryland on February, 2012 (he was previously licensed in Massachusetts and Connecticut).

9.      Mr. Patel applied for numerous positions in the federal government, for which he was well-qualified, but for reasons yet unknown to him, was not even granted an interview for those positions. Further, Mr. Patel also applied to many non-government positions in the District of Columbia metropolitan region, and for reasons yet unknown to him, he was not even interviewed by the large, medium, and small-sized law firms to which he applied.

10.     One of the only interviews Mr. Patel secured was in response to an application he made through Craigslist.com, which is one of the least traditional methods by which to obtain legal employment. Specifically, Mr. Patel responded to a position posted by the law firm Whittaker & Associates, by its principal Shawn Whittaker. Mr. Whittaker will later become a central part of this case.

11.     Mr. Whittaker hired Mr. Patel. However, on Mr. Patel's first week of employment, Mr. Whittaker went on a weeklong vacation, leaving Mr. Patel to 'man' the law firm as its attorney. Shortly after returning from his weeklong vacation, Mr. Whittaker terminated Mr. Patel.

12.     Mr. Patel continued working in a document review capacity. In addition, he continued applying for law positions.

13.     'Document review' is essentially paralegal-level work whereby a team of licensed attorneys review hundreds of thousands (and sometimes millions) of documents for responsiveness and privilege.

14.     Because Mr. Patel was unable to secure a position doing attorney-level work, he began laying the groundwork to launch his own law firm. Because Mr. Patel (for inexplicable reasons) was not able to even secure interviews at the hundreds of attorney positions to which he applied (except for the Craigslist ad posted above), starting his own law firm became the only option available to him to practice law.

15.      In addition, the wages he earned doing document review work was not commensurate with Mr. Patel's qualifications, relative to what his peers were earning as attorneys.

16.     On or about late 2011, Mr. Patel attended a volunteer event held by the District of Columbia non-profit organization "Bread for the City." The event was designed to provide no- or low-income people with a free legal consultation for their problems. At the event, Mr. Patel met with Carolyn Dumelfort, a former student of Howard University's Physician Assistant Program ("P.A. Program"). She had been unfairly terminated her from the program. Mr. Patel agreed to write a demand letter on behalf of Ms. Dumelfort at no cost to her. The demand letter sought to secure her readmission into the program. Howard University later denied her request for readmission.

17.     Later, Mr. Patel learned that less than 20% of the incoming students from Ms. Dumelfort's class actually graduated from the P.A. Program. Thereafter, Mr. Patel filed a Complaint on behalf of Ms. Dumelfort against Howard University. *(Dumelfort v. Howard University,* 2012 CA 005064 B, D.C. Superior Court). The Complaint included consumer protection, fraud, and contractual claims. Three other former students from the P.A. program joined the lawsuit.

18.     Because *Dumelfort* was the first ever lawsuit filed by Mr. Patel as a solo practitioner, and in light of the complexity of claims and workload involved, Mr. Patel sought the assistance of a senior attorney for guidance and oversight. Mr. Patel secured the assistance of Stephen Stern, Esq., who served as co-counsel for several years.

19.     Several years later, Mr. Stern withdrew from the case.

20.     Because Mr. Patel's deposition experience was very limited, and because the case involved several hundreds of thousands (and upward) of claimed damages, the clients and Mr. Patel agreed to secure the services of another senior attorney to serve as co-counsel.

21.     Thereafter, Mr. Patel spoke with Mr. Whittaker to serve as co-counsel. Specifically, Mr. Patel explained to Mr. Whittaker that the case needed an attorney who would take the depositions of the most important witnesses in the *Dumelfort* case. Further, the case needed a senior attorney to try the case, if necessary.

22.     After he was retained by the clients, Mr. Whittaker was scheduled to take the deposition of one of the professors at the P.A. Program. However, he backed out of the deposition three days before he was scheduled to take it. Mr. Patel thereafter filled in on very short notice to take the deposition of that witness. *See* Ex. 1.

23.     Thereafter, Mr. Whittaker was scheduled to take the deposition of the most important defense witness of the case: Ms. Powers, the chairperson of Howard's P.A. Program. The deposition was scheduled on August 14, 2015.

24.     A week prior to the deposition, on August 6, 2015, Mr. Patel emailed Mr. Whittaker to schedule a meeting to prepare him for Ms. Powers' deposition. Mr. Whittaker did not respond. *See* Ex. 2.

25.     The next day, on August 7, 2015 Mr. Patel emailed again and offered to visit Mr. Whittaker at his office to help prepare him for Ms. Powers' deposition. *See* Ex. 3.  Mr. Whittaker refused. Instead, he suggested meeting the following Monday on August 10, 2015 – four days before the deposition. *Id.* Mr. Patel agreed to meet him the following Monday. *Id.*

26.     On the morning of the scheduled meeting on August 10, 2015, Mr. Whittaker emailed the following:  "[Mr. Patel], I am not feeling well today, but I have to be in the office to finish these 2 briefs.  I am really struggling. I need to reschedule our meeting." The deposition of the most important witness in the case was four days away.  Mr. Patel replied asking when they could meet. Mr. Whittaker did not respond. *Id.*

27.     On August 12, 2015, Mr. Patel emailed Mr. Whittaker again to request meeting with him to prepare him for Ms. Powers' deposition. *See Ex. 4.* Mr. Whittaker did not respond.

28.     On August 13, 2015, the day before the deposition, Mr. Patel emailed Mr. Whittaker again requesting that they meet to go over the deposition, which was now only one day away. Mr. Whittaker replied: "[Mr. Patel]. **I did not put tomorrow on my calendar.** Everyone kept switching depo dates and I didn't know who was going when.  **I am in court most of today and tomorrow.**  I apologize.  Maybe it's best if you get another co-counsel as I am way behind in this case and can't keep up with everything since I am so behind." *See* Ex 5.

29.     Upon receiving this email, Mr. Patel forwarded the email exchange wherein Mr. Whittaker proposed the August 14, 2015 date for Ms. Powers' deposition, which was confirmed by opposing counsel and Mr. Patel. *Id.* Mr. Whittaker replied: "I know we

exchanged emails.  As I said, there were a lot of emails. And I did not receive a notice of depo.  **So I did not put on my calendar.** I apologize for the mistake or confusion." *See* Ex. 6.

30.     This was not true. Mr. Whittaker had put the deposition date on his calendar.  On July 7, 2015, when the deposition dates were confirmed, Mr. Whittaker sent a calendar invite by email to Mr. Patel and three employees at his law firm to calendar the deposition on August 14, 2015. *See* Ex. 7.

31.     Mr. Patel called Mr. Whittaker to discuss what options they had to postpone the deposition, since it was critical to the case and an experienced attorney was needed to take the deposition. Mr. Whittaker explained that he was far too busy to get caught up and that Mr. Patel would have to take the deposition.

32.     Mr. Whittaker's auto-response email on the night of August 13, 2015 was the following: "I am out of the office August 13, 2015 returning August 16, 2015." *See* Ex. 8.

33.     On August 14, 2015, on short notice, Mr. Patel attempted to take the deposition of Ms. Powers.  However, after no more than 30 minutes, Mr. Patel felt obligated to terminate the deposition because he was not able to obtain responsive answers from the witness. She was assisted by a very experienced attorney.

34.     In addition to the above very obvious transgressions against the code of professional responsibilities, Mr. Whittaker was overall very negligent in his representation of the clients. For example, throughout the course of his "representation" of the clients, Mr. Whittaker was largely unresponsive to emails and was unavailable for phone calls. There are many examples of emails where Mr. Patel requested Mr.

Whittaker's advice or suggestions on the case and he would simply not answer. Mr. Patel has attached a few examples. *See* Ex. 9

35.     After several months of this behavior, Mr. Patel began to realize that Mr. Whittaker had no interest in actually working on the case. During the rare times Mr. Patel was able speak with Mr. Whittaker by phone, it was obvious that he knew very little facts about the case. With regard to the legal theories, such as the causes of action, Mr. Whittaker was also largely unaware.

36.     Although Mr. Whittaker's self-proclaimed expertise in consumer protection law (and summary judgments) would have been very useful in drafting the Opposition to Defendant's Motion for Summary Judgment, Mr. Whittaker flatly refused to contribute, stating that he did not have time to work on it. Mr. Patel drafted and filed the Opposition by himself with zero assistance from Mr. Whittaker.

37.     Mr. Whittaker acknowledged "he hadn't done much" in the case in an email on March 23, 2016 (one year after joining the case) and voluntarily offered to "reduce [his] fees." *See* Ex. 10.

38.     Mr. Patel's last day working with Mr. Whittaker was on September 15, 2016. On that day, Mr. Whittaker responded to Mr. Patel's question about one of his collection cases by yelling and screaming insults from the top of his lungs. The yelling, screaming and insults had occurred several times before but on that day it was particularly bad. The entire office, including a temporary worker, heard the abuse. Shortly afterward, Mr. Patel sent an email to Mr. Whittaker resigning from the job. *See* Ex. 11.

39.     On paper, Mr. Whittaker continued to 'represent' the *Dumelfort* clients, even though Mr. Patel had resigned from the temporary job with Whittaker & Associates.

40.     After Mr. Patel and the *Dumelfort* clients prevailed on their most important counts on Howard University's Motion for Summary Judgment, the case was set for trial.

41.     Several months before trial, the case was set for mediation. During that mediation, Mr. Whittaker was completely unprepared. Despite being on the case for close to two years, Mr. Whittaker still did could not recall the clients' names (there were only three), including the lead Plaintiff's, Ms. Dumelfort. At mediation, Mr. Whittaker knew close to none of the pertinent facts or legal theories involved in the case. Despite his unpreparedness, Mr. Whittaker was vociferously skeptical about the case with the clients and expressed his doubt that they would prevail at trial. He frequently told the clients that Howard University's arguments were strong and the clients could walk away with nothing, while saying nothing to the mediator about the strengths of the case to obtain a higher settlement.

42.     At one point during the mediation, the clients asked Mr. Whittaker to leave the room because they could not understand why he was so negative about their case.

43.     Ultimately, the case settled, at a much lower amount than the clients had sought. A significant factor was that the clients were dismayed by Mr. Whittaker's comments and attitude about taking the case to trial.

44.     After the settlement proceeds were received for the Dumelfort case, Mr. Patel informed Mr. Whittaker that he intended to pursue a civil rights action against him and his law firm for the racial discrimination and harassment he was subjected to during his employment.  *See* Demand Letter attached as Ex. 12.

45.     Although Mr. Patel's civil rights claims had nothing to do with the Dumelfort clients, Mr. Whittaker retaliated against the clients, attempting to place an attorney's lien on their settlement proceeds. *See* Ex. 13. In other words, Mr. Whittaker became adversarial to the clients by sending them demand letters which threatened to file lawsuits against them. *Id.*

46.     Mr. Patel called the D.C. bar ethics hotline for guidance on how to handle the matter. Upon consulting with the D.C. bar ethics' staff attorney, Mr. Patel released the clients' settlement funds. This action was taken in spite of Mr. Whittaker's frivolous and abusive lien. Mr. Patel also released attorneys' fees from the settlement fund to Mr. Stephen Stern, who was the prior co-counsel in the *Dumelfort* case.

47.     In the email exchanges that ensued, Mr. Whittaker was incapable of separating Mr. Patel's civil rights action against him and the *Dumelfort* case, despite Mr. Patels' several reminders that the two were separate. *See* Ex. 14.

48.     The *Dumelfort* clients became upset by Mr. Whittaker's behavior and subsequently authorized Mr. Patel to secure counsel to sue Mr. Whittaker for legal malpractice. Despite knowing that the clients disputed the fee, Mr. Whittaker attacked Mr. Patel personally several times for "stealing" his claimed fee.

49.     After the *Dumelfort* clients instructed Mr. Patel to withhold the disputed fee claimed by Mr. Whittaker, he engaged in abusive and unethical retaliatory tactics including having *ex parte* communications with them after making himself adversarial to them.

50.     Mr. Patel instructed Mr. Whittaker that the clients were represented and he could not communicate with the clients directly. *Id.* Nevertheless, Mr. Whittaker

continued sending threatening emails to the clients despite Mr. Patel's warning that he would be violating the ethical rules. *Id.*

51.     Mr. Patel continued to withhold the disputed fees in his law firm's IOLTA account.

52.     Mr. Whittaker thereafter filed a complaint with the Attorney Grievance Commission in Maryland against Mr. Patel. *See* Ex. 15. Mr. Whittaker's chief complaint was that Mr. Patel had not disbursed the disputed attorney's fee from the *Dumelfort* settlement.

53.     In response, Mr. Patel filed a counter Complaint with the Attorney Grievance Commission. Mr. Patel's Complaint described with specificity Mr. Whittaker's numerous acts of professional misconduct, many of which were severe and extremely harmful to the profession, as described in the paragraphs above. *See* Ex. 16.

54.     Mr. Patel's counter Complaint filed with the AGC detailed, for example, the following facts:

- Mr. Whittaker's failure to attend the deposition for the first Howard University professor, days before he was schedule to take it.

- Mr. Whittaker's failure to attend the deposition for Ms. Powers, the most important defense witness in the case, **one day** before he was scheduled to take it.

- Mr. Whittaker's general lack of attention to the case.

- Mr. Whittaker's failure to contribute anything toward the Opposition to Howard University's Motion for Summary Judgment

- Mr. Whittaker's abusive behavior toward Mr. Patel

- Mr. Whittaker's conduct during the mediation for the *Dumelfort* case, including his abject failure to advance his client's case in front of the mediator.

55.     Upon information and belief, the AGC and the named Defendants thereafter failed to investigate the allegations of professional misconduct made by Mr. Patel.

56.     Upon information and belief, the Defendants acted with malicious and corrupt intent in its handling of both a) Mr. Whittaker's Complaint against Mr. Patel and b) Mr. Patel's counter-complaint against Mr. Whittaker.

57.     Specifically, upon information and belief, the Defendants failed to conduct an investigation into Mr. Patel's Complaint, including, but not limited to: Mr. Whittaker's abysmal failure to work on the *Dumelfort* case, his failure to attend the depositions for which he had been specifically retained; his abusive conduct; and his improper payment of employees as contractors.

58.     In the alternative, if the Defendants did conduct an investigation into Mr. Patel's Complaint, it 'covered up' its findings.

59.     Upon information and belief, the Defendants violated its own rules regarding the proper investigation of complaints of attorney misconduct.

60.     Several years after the Complaints were filed, the Defendants issued Mr. Patel a reprimand.

61.     Meanwhile, the Defendants issued Mr. Whittaker only a warning, even though he had committed much more injurious acts to the profession. The disparity in discipline evinces a malicious or discriminatory intent.

62.     Further, the Defendants unfairly applied standards of misconduct against Mr. Patel even though Mr. Whittaker's misconduct was objectively much more severe.

For example, Mr. Whittaker flat-out did not know the facts and theories of the case in which he was retained to serve as experienced counsel. Further, he failed to attend two depositions in the case, one of which was the most important of the case, and he further *admitted to not having done much in the case*, by email.

63.     Yet, the Defendants issued Mr. Whittaker a warning for his gross misconduct. Meanwhile, the Defendants issued Mr. Patel a reprimand for considerably less injurious conduct to the profession.

64.     Further, Mr. Patel and the AGC entered into a Conditional Diversion Agreement (CDA). *See* Ex. 17. The Defendants required that Mr. Patel's law practice be 'monitored' by another attorney. This punishment was leveled against Mr. Patel even though his misconduct was considerably less harmful to the profession than Mr. Whittaker's, who was issued only a warning. Upon information and belief, the Defendants did not require Mr. Whittaker's law practice to be monitored.

65.     There was an inexcusable level of double-standards and hypocrisy in Defendant's handling of the respective Complaints made by Mr. Patel and Mr. Whittaker against each other. For example, in issuing Mr. Patel a reprimand, the Defendants alleged that Mr. Patel failed to advise his clients of the dispute between himself and Mr. Whittaker. However, Mr. Whittaker *also* failed to advise the clients of the dispute, but he did not receive the same level of discipline from the Defendants.

66.     Additionally, while one of the charges leveled against Mr. Patel was that he failed to inform the *Dumelfort* clients of Mr. Whittaker's numerous acts of misconduct, for which Mr. Patel received a reprimand, Ms. Risch and the AGC sought less discipline

for the *actual culprit* of the acts of misconduct, Mr. Whittaker, who was issued only a warning.

### FIRST CLAIM FOR RELIEF (42 U.S.C. § 1983 – DISCRIMINATION)

67. The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

68. Defendants at all times relevant to this action were acting under the color of law.

69. The Defendants' discrimination against Mr. Patel, including discrimination with regard to the discipline sought and issued against him, relative to discipline sought against Mr. Whittaker, indicates a malicious and corrupt motive by a state actor in violation of Mr. Patel's due process and equal protection rights, and must be redressed.

70. Further, upon information and belief, it was a custom or policy for the Defendants to engage in the unconstitutional conduct alleged in this Complaint.

71. For the conduct set forth above at paragraphs 1 - 62, Mr. Patel seeks compensatory and punitive damages, payment of attorneys' fees and costs, and all other relief that the Court may deem just and proper against Defendant.

### SECOND CLAIM FOR RELIEF (42 U.S.C. § 1983 – DUE PROCESS)

72. The allegations of each of the foregoing paragraphs are hereby incorporated by reference.

73. Defendants at all times relevant to this action were acting under the color of law.

74. The improper conduct of the Defendants, in particular with its numerous failures of conducting a proper investigation, and its failure to timely communicate with

Mr. Patel, its unreasonable level of a 'reprimand' charge against Mr. Patel, and its requirement that Mr. Patel be monitored, violated Mr. Patel's due process and privacy rights.

75.     For the conduct set forth above at paragraphs 1 - 62, Mr. Patel seeks compensatory and punitive damages, payment of attorneys' fees and costs to redress the illegal and unconstitutional conduct of Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

a)  a declaration that defendants' actions deprived Mr. Patel of his federally protected rights;

b)  back pay in an amount to be proved at trial;

c)  front pay in an amount to be proved at trial;

d)  compensatory damages for emotional distress, humiliation, embarrassment, harm to his career, loss of income, and mental anguish in an amount to be proved at trial;

e)  punitive damages in an amount to be proved at trial;

f)  costs and expenses of this action, including, but not limited to, reasonable attorneys' fees and litigation costs; and

g)  such other relief as the Court finds necessary and appropriate.

## Request for Jury Trial

Plaintiff requests a trial by jury on all matters properly tried to a jury.

Respectfully submitted,

Dated:  May 26, 2022

_/s/  Nishith Patel_
Nishith Patel
9841 Washingtonian Blvd.
#200
Gaithersburg, MD 20878
npatel@npatellaw.com